Good morning. I'm Ralph Ellenwood from Tucson. I'm here for Javier Munoz-Peralta. At the very least, in this case, what we seek is a remand for a new trial. The trial judge should have submitted the issue of official restraint to the jury and instead decided it himself. In order to understand the situation here, I think the facts are very important. Mr. Munoz-Peralta was found in a remote desert area to the west of Naco, Mexico, which is just south of Bisbee in Cochise County in eastern Arizona. This is a desert area. There is one paved highway to the north of the border, which the agent described as being three to four miles from the border fence. The border itself is a standard barbed wire fence running along the border, and the government has graded and prepared a dirt road which runs right along the border itself, just exactly north of the border fence. In the area are a number of sensors, and this area also had portable lighting systems. The area in which Mr. Munoz-Peralta was found was a low-lying area or a draw, and on the hills on either side were lighting fixtures. It was at night. The agent testified at trial that he and his companion had been up and down the road on ATVs a number of times that evening. They received a radio call of a sensor hit in the area, immediately returned to the area, which they had passed just a short while before, and found fresh human prints, a small group of prints going north from the border fence itself. So the point of entry was— So the first knowledge of the Border Patrol was not until the defendant hit the sensor, right, which is a couple hundred yards inside the border. Isn't that true? Temporarily, that was what triggered their attention, but the identity— But geographically, he was 200 yards inside the country already. He was in— Doesn't that mean he was not under any surveillance until he was at least 250 yards in? Well, Your Honor, I think the focus on surveillance is a narrowing of the official restraint doctrine away from what it was intended, which is constructive custody. Doesn't mean we're not bound by that law. Well, Your Honor, I think Pacheco Medina speaks in terms of constructive custody. It talks about visual or physical grasp of the authorities. What was the visual or physical grasp that you're asserting in this case? Your Honor, when this group, including Munoz-Peralta, crossed the fence, they stepped into a trap from which there was no escape. The footprints right at the border fence alerted the authorities, in addition to the sensors, exactly where they were. The testimony at trial was that the prints were absolutely fresh. They knew they were fresh because they'd just been through the area before the government— Why doesn't Hernandez-Herrera preclude your argument? Well, I think that the facts in this case— I think it was wrongly decided, right? I think the facts in this case are more compelling, actually, because there is a whole plethora of circumstance which shows that this group, including Munoz-Peralta, was never going to escape from the trap which they had stepped into. But isn't that the same as Hernandez-Herrera? Wasn't he in a brush area from which there was no escape? Well, I don't – I didn't read Hernandez-Herrera as having the same – the same tracing from the border, I guess I should say, that this case has. I didn't see it that way. I guess I don't – I'm not quite getting the guiding principle that you want us to follow here. Is it that the sensor goes off and the person doesn't get very far? Is that what it is? Is it that if the tracks had been 500 feet, would you make the same argument? I mean, is it a remote area? You trace these tracks and they go 1,000 feet? Well, the guiding principle, Your Honor, that I'm seeking here is that this is a jury issue on an element of the crime, not to be decided by the court independently. If there's some evidence to support an official restraint instruction, it ought to be given. But he wasn't restrained. He wasn't seen. He wasn't in custody. He wasn't – they didn't know when – they didn't know when he – at the time he crossed over, they didn't know he was there. Isn't that right? Well, Pacheco – excuse me, Your Honor. Isn't that correct? Not the way I read Pacheco-Medina. No, because I'm asking about the facts of this case. They didn't know when he – He was not seen crossing the border. Right. I will concede that. What I think is different and compelling and different, particularly from Castellanos-Garcia, is that, for instance, in Castellanos-Garcia, the court asked, well, there's no evidence of precisely where he crossed the border. Well, in this case, there is evidence of precisely where he crossed the border. We know exactly where he did and the government did. There's no evidence of the route from the border to capture, says the court in Castellanos-Garcia. Well, in this case, there is exactly the route. We know what it was. It was like a neon sign following Munoz-Peralta as he entered the country. It was fresh prints, absolutely crisp prints, easily followed at night with a flashlight by an agent who walked right from the border to exactly where they were. Because in Pacheco-Medina, wasn't the alien in the agent's sight except for a split second when he went around a corner? That's true, Your Honor. So what language are you relying upon in Pacheco-Medina which you say supports your argument? Because the facts are different. Well, at 1165 in Pacheco-Medina, quoting from U.S. v. Aguilar, the court says, The doctrine is premised on the theory that the alien is in the government's constructive custody at the time of the physical entry. And going on at 1165, the phrase is visual or physical grasp of the authorities. That's why I say that I don't think that the doctrine requires visual all the time. It is an alternative theory, and physical grasp of the authorities is equally important and compelling when it comes to constructive custody. Here, that's what we had. There's no escape, no ability to go anywhere. The entry was detected very shortly after the group entered through the barbed wire fence, and they left behind a trail which was perfect. How do you get past Hernandez-Herrera's holding that says if tracking of footprints leads to the apprehension, that's not official restraint? How do you get past that language? Well, again, Your Honor, I think that the facts here are more compelling. I think the presence of the lights, I think the presence of the sensors, I think the regular patrol along the border, the dirt. Where were the lights? Where were the lights in this case? They were on either side of the draw in which Hernandez, I mean, which Munoz-Peralta was found. Where's in the record that there were lights there? I thought it was unlit. I'm sorry? I thought the area was unlit. Where in the record does it say it was lighted? There were portable lights. I'm not certain. I know that that was the testimony at trial. I'm not prepared. But you don't know where in the record that is? I don't. You have about a minute left. Thank you. Are there any further questions? Otherwise, I'll reserve for rebuttal. Thank you. Thank you. Maybe you can find that citation to the record while you're there.  Thank you. Now, all of the defendant's appellate arguments come down to one particular issue. That is, if the defendant was under official restraint from the time that he entered the United States from Mexico until the time he was apprehended by Border Patrol. In this particular matter, the evidence is overwhelming that the defendant was not under constant surveillance, giving rise to official restraint from the time that the sensor was triggered, which was 200 to 250 yards within the border, until he was found 300 yards within the border, approximately 15 to 20 minutes after that initial sensor was tripped. And he was found by what? By tracking? How he was found was that, in a sense, it was a form of tracking because the sensor was set off. They don't know what set it off originally. They did see the footprints going by the sensor, and we don't know if it was the defendant's foot who set it off or if it was another member of the group. And then once they went to the sensor, they followed the footprints by a flashlight because the light towers could not illuminate that area, and then they found him approximately 20 minutes after that sensor had been originally tripped. Counsel, could you respond to opposing counsel's argument that because the footprints were so close to the border, that that's constructive custody on the part of the government? Well, I would disagree completely with that in looking at the cases in this matter, that there has to be constant surveillance. In this particular matter, all the footprints were after the fact once he was already within the United States able to breathe the free air of the United States. In this matter, we don't even know if those footprints matched exactly of the defendant. There was no evidence as to that. During the time in which they did find the footprints, she had already been in the United States for approximately 10 minutes, and so there was no constructive possession of him because there was no way to know he was there during the time when she initially crossed the border. Okay. I take it that you think Hernandez-Herrera is a great decision. Oh, first, I think that it is the controlling law in this particular matter, and I believe ñ Or as we say, it's good enough for government work, right? Yes. So I would say those are the controlling cases, no constant surveillance in this matter. Therefore, the judge in the district court did not abuse his discretion in denying the jury instruction. There was no factual foundation for it. Thank you, counsel. There don't appear to be any further questions. Thank you. Thank you. Mr. Allen, would you wish to add anything? The only thing that I would add is that the road maintained along the border, the purpose of which was to identify immediately entry, and the importance of this is underscored by the fact that the Border Patrol maintained constant up and back and forth vigilance of that, is the functional equivalent as if they'd had video cameras or anything else there. The purpose was to immediately identify within a very short period of time whether anyone had crossed the border. And I think that that gives a constructive custody. I think the fact that this group, including Munoz Peralta, were in a trap, lights on both sides, they could not escape three to four miles from the nearest paved road that they could conceivably have stopped the tracking of the footprints. And the fact that temporarily this happened very shortly, I think, is constructive. Thank you. Thank you, counsel. The case just argued is submitted for decision. That concludes the Court's calendar for this morning and the Court stands adjourned. Thank you.
judges: Schroeder, Tashima Rawlinson